# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF PHILLIP J. WERNER,
c/o MARGARET C. WERNER,
SPECIAL ADMINISTRATOR,
MARGARET C. WERNER, individually,
and in her capacity as Guardian of WNW, minor,

        Plaintiffs,

    v.                            Case No. 04-C-0557(E)

JOHN E. POTTER,
POSTMASTER GENERAL,
UNITED STATES POSTAL SERVICE, and
UNITED STATES OF AMERICA,

        Defendants.

---

## DECISION AND ORDER DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, DENYING WITHOUT PREJUDICE DEFENDANT'S MOTION TO DISMISS, AND SETTING SCHEDULING CONFERENCE

       This case comes before the court on two pending motions: plaintiffs' motion for partial summary judgment and defendants' Rule 12(b)(6) motion to dismiss. Before turning to the merits of the motions, there needs to be some discussion about case management. Plaintiffs filed two cases, which were consolidated under this case number. This court agreed to allow the parties to brief the issue of standing with respect to discrimination claims brought by the estate of Phillip J. Werner. Rather than limiting their arguments to the standing issue as instructed, the parties briefed issues ranging from the equitable tolling of the limitations period under EEOC regulations to the merits of the discrimination claims. Plaintiffs concede

that this "case really involves questions of equitable tolling and estoppel as well as reasonable accommodation masquerading as an issue of standing."

At some point, it had to become apparent that these issues could not be resolved as a matter of law. Plaintiffs have argued that they have not had an opportunity to conduct formal discovery, and there is no scheduling order in place. As a result, the process which was intended to streamline this litigation and conserve judicial resources has had the opposite result. After discussing the motions below, the court will set this case on an expedited schedule to prevent further delay.

STANDARD

After the pleadings closed, defendants filed their motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. When reviewing a Rule 12(b)(6) motion to dismiss, the court accepts all allegations as true and draws all reasonable inferences in favor of the plaintiff. *Brown v. Budz*, 398 F.3d 904, 908 (7th Cir. 2005). The court should not grant a motion to dismiss unless it appears beyond doubt that the plaintiff cannot prove his claim under any set of facts consistent with the complaint. *Id.*, 398 F.3d at 908-09.

Similarly, a motion for judgment on the pleadings under Rule 12(c) is appropriate if "it appears beyond doubt that the plaintiff cannot prove any facts that would support [her] claim for relief." *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). The court considers the complaint, answer and any written instruments attached to those pleadings, accepts all well-pleaded allegations in the complaint as true and draws all inferences in favor of the plaintiff. *McMasters v. United States*, 260 F.3d 814, 817 (7th Cir. 2001). In considering a motion to dismiss under Rule 12(b)(6) and a motion for judgment on the pleadings under Rule 12(c), the court must treat as true all factual allegations in the

complaint and must give the plaintiffs the benefit of factual assertions that are not inconsistent with the complaint's allegations. *See, e.g., Olson v. Wexford Clearing Servs. Corp.*, 397 F.3d 488, 490 (7th Cir. 2005) (same standard under both provisions).

Because defendants have moved beyond the pleadings, the court construes the motion as one for summary judgment. Under Rule 56, the court must consider evidence in the light reasonably most favorable to the nonmoving parties. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## FINDINGS OF FACT

Phillip Werner's psychiatric condition was the subject of treatment even before his employment with the United States Postal Service (USPS). (Ex. 1000) For example, in 1977, he was arrested in Chicago for throwing stones at cars and for attempting to have a blackbird land on his shoulder and that his mental health condition played a role. (*Id.*) Werner received treatment at the VA Medical Center in Milwaukee for his mental health condition in 1977, 1978, 1983, 1984, and 1985 (*Id.*). On December 5, 1979, Faye D. Werner obtained a Judgment of Divorce from Werner. (Ex. 1001)

On February 14, 1987, Werner married Margaret Catherine Nelson. (Aff. M. Werner, ¶ 2, Ex. 1) They separated on June 28, 2001, and Margaret Werner filed for divorce in Waukesha County on September 20, 2001. (Aff. M. Werner, ¶ 2; Ex. 1063) However, they were still married at the time of Werner's death on October 12, 2001. (*Id.*)

On May 9, 1988, Werner applied for employment with the USPS. (Ex. 1003) He applied for a "Veteran Preference" in connection with his service in the United States Army from February 26, 1972, to June 13, 1973. (*Id.*) By a "Medical Examination and Assessment" signed on May 12, 1988, Werner asserted that the United States Department of Veterans

3

Affairs had assessed him a 30% disability rating for an emotional disorder. (*Id.*) In that regard, by a "Deferred or Confirmed Rating Decision" dated November 27, 1987, the United States Department of Veterans Affairs, stated that Werner's veteran's disability was "service connected for schizophrenia." The document indicated that Werner's condition caused him multiple problems with respect to conducting his business as a self-employed roofer. (*Id.*)

In a note dated June 27, 1988, Dr. Robert F. Testin, identified no indications that Werner had a schizophrenic disorder or that he had thought-process distortions or peculiarities that were commonly observed in schizophrenic patients. (Ex. 1004) Dr. Testin later issued a report stating that Werner appeared to be a "healthy, intellectually well-above average individual who seems to be free of any major organic or functional psychopathology." He stated that Werner would benefit from some psychotherapy, but it was not an imminent necessity. He also opined that Werner was "presently up to functioning efficiently in any ordinary occupational role without professional help." (*Id.*)

Werner began his employment with the Postal Service on July 30, 1988. (Defendants' Answer to Plaintiff's Amended Consolidated Complaint, ¶ 7; Ex. 1007) He resigned effective October 4, 1988. (Defendants' August 25, 2004, Answer, ¶ 7; Ex. 1008) On Werner's Postal Service Resignation Form dated September 29, 1988, typed and prepared by Postal Service personnel, Werner identified three substantive areas of dissatisfaction with his Career Carrier position in New Berlin/Waukesha, including:

A. Felt lost in both casing and delivering mail in a foreign environment.

1. Comfortable with the City of Milwaukee.
2. Prefer to [unclear] extensive knowledge of street system in Milwaukee, Wauwatosa, Menomonee

4

> Falls, Germantown, Brown Deer and
> Fox Point.
>
> B.     Prefer walking [unclear] vs. motorized route.
>
>     1.     Enjoy the outdoor walking vs. riding.
>
> C.     Prefer less commuting.

(Ex. 1008)   On December 15, 1988, the Postal Service inquired further about the circumstances surrounding his resignation, and Werner was reinstated as an employee on March 1, 1989.  (Ex. 1009)

On March 13, 1989, Werner elected to obtain life insurance through his employment with the Postal Service.  (Ex. 1010) On November 26, 1989, Werner signed a "Thrift Savings Election Form."   The form was signed on behalf of the Postal Service by Theresa Porter, Acting Supervisor, Compensation and Staffing.  (Ex. 1011)

Margaret Werner gave birth to Phillip Werner's son, WNW, on December 19, 1989.  WNW was born with a substantial hearing impairment.  (Aff. M. Werner, ¶ 3, Ex. 5)

Werner was admitted to the emergency room of the Milwaukee County Mental Health Complex on March 24, 1992, due to his agitated state and possible alcohol dependency. (Aff. Knight, ¶ 4(d),  Ex. 6)   On April 22, 1992, Werner was admitted to Milwaukee Psychiatric Hospital for inpatient treatment and was observed exhibiting manic symptoms.  (Aff. Knight, ¶ 4(e), Ex. 7)   On April 24, 1992, Werner began his care and treatment under the auspices of Dr. John Rohr, of the Institute for Mental Health, located at 14555 West National Avenue, Suite 192, New Berlin, Wisconsin, 53151.  Dr. Rohr diagnosed Werner with manic-depressive bipolar disorder.  (Aff. Knight, & 4(e), Ex. 7; Aff. Rohr, ¶ 2)

Werner remained under the care and treatment of Dr. Rohr from 1992 up to his death in 2001. (Defendants' August 25, 2004, Answer, & 13; Aff. Rohr, ¶ 1)

In a letter dated May 13, 1992, Drs. Larry Heller and Charles Engel of the Addiction Medicine Service notified Scott McLellan of the Postal Service Mail Handlers Union that Phillip Werner was "presently being treated for his psychiatric condition and his behavior improved dramatically.@ (Aff. Knight, ¶ 4(e), Ex. 7) The Postal Service was notified of and was aware of Werner's diagnosed bipolar manic depressive disorder. (Plaintiff's Amended Consolidated Complaint, ¶ 15; Defendants' August 25, 2004, Answer, & 13) Also, it admits it was notified of Werner=s admission for repeated inpatient and outpatient treatments for bipolar manic depressive disorder. (Plaintiffs' Amended Consolidated Complaint, ¶¶ 13, 15, and 19; Defendants= August 25, 2004, Answer && 13, 15, and 19)

On May 5, 1992, the Postal Service issued Werner a Notice of Proposed Removal, citing "bizarre@ or Ainappropriate@ behavior. (Aff. Knight, & 4(e), Ex. 7; Defendants= August 25, 2004 Answer, & 13) The Postal Service issued a decision that effective June 30, 1992, Werner would be removed from employment with the Postal Service. (Ex. 1024) On July 14, 1992, Werner=s primary mental health physician, Dr. Rohr, sent a letter to David Stenson, Werner=s union steward, to notify the Postal Service that, in his medical opinion, Werner=s alleged inappropriate behavior was a product of his manic-depressive illness. (Aff. Knight, & 4(f), Ex. 8) In a settlement, the parties agreed that the proposed removal would be reduced to a long-term suspension for the period running from June 30, 1992, to September 16, 1992, and that Werner would not receive backpay.

In August of 1992, Terry Porter, as the Postal Service representative overseeing Werner's unemployment claim, became aware of Werner's mental disability and the extent

to which his cognitive functioning and appreciation of the consequences of his behavior are impaired during manic episodes.  (Aff. Knight, ¶ 4(g), Ex. 9)  On September 8, 1992, Dr. Rohr informed the Postal Service that Werner was being seen in his office and that he "continues to actively participate in his recovery program."  (Aff. Knight, ¶ 4(h), Ex.10)

On October 27, 1992, Dr. Rohr informed the Postal Service that Werner would remain under his care for treatment for his bipolar disorder, and that Werner was fully complaint with the terms of his treatment program.  Dr. Rohr also wrote a letter to Ralph Bailey informing him that Werner would continue under his care and treatment on a monthly basis, that he was taking Lithium, and that he had been "fully compliant with his treatment program."  (Aff. Knight, & 4(j), Ex. 12)

Dr. Rohr updated the Postal Service on December 21, 1992, and March 9, 1994, that Werner was continuing under his medical care for a mental impairment.  (Aff. Knight, & 4(k), Ex. 13)  Dr. Rohr requested reasonable accommodations for Werner, specifically that he work no more than 9 ⊇ hour workdays and no more than 6 days per week. (Aff. Knight, & 4(l), Ex. 14)  On June 27, 1994, Dr. Rohr again updated the Postal Service that Werner was continuing under his medical care.  Dr. Rohr requested, for a second time, reasonable accommodations(no more than 9 ⊇ hour workdays and no more than 6 days a week), and that such a request should be in effect for the following six months.  (Aff. Knight, & 4(m),  Ex. 15)

On November 2, 1995, Werner was admitted to St. Luke's Hospital for inpatient treatment for his mental disability of Αbipolar affective disorder.@  Werner continued to be treated by Dr. Rohr.  He was discharged from St. Luke's on November 22, 1995 after stabilizing behaviorally.  (Aff. Knight, & 4(m), Ex. 16; Aff. Knight, ¶ 4(n), Ex. 17)

7

On November 29, 1995, Catherine Pipes, Werner=s supervisor at the Postal Service, alleged the following: that Werner poured mail onto a conveyor or sorting belt that he should not have, that she told him not to do this, but he told her that if she wanted to do his job she could in order to see what Athey@ have to go through.  Pipes maintained that Werner then walked away.  When he returned, Pipes asserted that she gave him a direct order to dump a certain (correct) batch of mail, and Werner replied that she should write him up while it is still fresh in his mind. (Aff. Knight, & 4(o), Ex. 18)

On December 1 and 2, 1995, Pipes contended that Werner called in sick.  He allegedly called into the Postal Service attendance office according to proper procedures. (Aff. Knight, & 4(o), Ex. 18)  Next, on December 5, 1995, Pipes alleged that Werner punched out early after two hours of work, rendering him Absent Without Official Leave (AWOL).  (Aff. Knight, & 4(o), Ex. 18)

On December 6, 1995, Pipes offered the following: she asked Werner why he left work early on December 5, 1995, and he replied that he Ahad eleven (11) hours of annual leave to burn.@  Pipes stated that she informed him that he had no annual leave, and he replied, AWell then, I guess I took my first day of LWOP [leave without pay].@ Pipes told Werner that he must obtain permission from a supervisor before he could leave, no matter the reason.  Also, she stated that, regardless of the reason, Werner must fill out a 3971 form before departing on any type of leave.  Pipes finally informed Werner that she was marking him AWOL on December 5, 1995.  (Aff. Knight, & 4(o), Ex. 18)

On December 8, 1995, Pipes submitted that Werner hit the emergency stop button on his machine three separate times, at 6:59 a.m., 7:30 a.m., and 8:24 a.m.  After the first time, Pipes asked him why he stopped the machine and he replied, Awe needed

8

equipment.@  Pipes showed Werner that there was sufficient equipment, and that he in turn stated, AOkay, start her up.@  Werner stopped the machine two more times for the same reason with the same response from his supervisor.  Pipes proceeded to place him on a non-duty/non-pay status.  The letter communicating this situation was copied to Mary Sanchez, Postal Service Human Resource Specialist for Injury Compensation of the Milwaukee District Office.  (Aff. Knight, & 4(o), Ex. 18)

Pipes claimed to document her concerns about Werner=s bizarre and/or inappropriate behavior in a report provided to Sanchez on December 8, 1995.  Pipes noted that several people had come to her with reports about various Aunusual things" Werner had been seen doing at the Postal Service.  Pipes indicated that Werner should be forced to undergo a Fitness for Duty examination, based on the following reported events:

| | |
|---|---|
| a. | Phillip had poured hot coffee on his hand in front of three co-workers; |
| b. | Phillip gave a bike away to a co-worker in the mail handling department; |
| c. | Phillip showed clerks an 8x10 picture of his niece when she was nine (9) years old (at the time she was 19).  When asked why he had such a large picture, Phillip matter of factly replied, "I don=t have a wallet size@; |
| d. | A clerk observed Phillip stomping on ketchup packets; |
| e. | Phillip brought a garment bag to work and kept changing his clothes; |
| f. | Phillip had gotten several hair cuts in a single week; |
| g. | Phillip gave Ms. Snipes a vial of perfume to wear and stated, AIf you=re my supervisor, you need to wear this, it=s alcohol free.  I=m a recovering alcoholic@; and |
| h. | Phillip kept wandering from his work area and became upset when his supervisor paged him back to the area. |

Sanchez, in turn, later faxed the report to Dr. Walter Davison.  (Aff. Knight, & 4(o), Ex. 18)

On or about December 8, 1995, Postal Service Human Resource Specialist Sanchez spoke to Dr. Andrew Seter, a doctor at the Work Injury Care Center, 575 W. Deluxe Parkway, Glendale, Wisconsin, 53212, regarding Werner=s Ainappropriate@ behavior. (Aff. Knight, & 4(p), Ex. 19) On December 8, 1995, Dr. Seter responded to Sanchez's concerns and suggested that Werner be evaluated by a psychiatrist immediately, and further recommended that Werner be considered unfit for duty until such an evaluation could be completed. (Aff. Knight, & 4(p), Ex. 19)

On December 8, 1995, Pipes placed Werner on Anon-duty/non-pay status@ effective December 9, 1995. Pipes instructed Werner "not to report back to work until you submit satisfactory medical documentation that you are fit for full duty. Such documentation should be turned in to the health unit after you contact them to make arrangements to enter the building.@ (Aff. Knight, ¶ 4(q), Ex. 20)

That same day, Pipes requested a Fitness for Duty evaluation for Werner. (Aff. Knight, & 4(r), Ex. 21) Also on December 8, 1995, Sanchez issued a memo to Lead Plant Manager for Processing and Distribution, Richard Lindsey, confirming his approval for the proposed Fitness for Duty Examination for Werner. Sanchez noted: AAs discussed, it has been reported that Mr. Werner has been engaging in bizarre behavior. Our contract physician has indicated that he would recommend an immediate evaluation by a psychiatrist.@ The memo was copied to Herman West, Manager of Human Resources, the Health Unit, the Safety Specialist, and Labor Relations. (Aff. Knight, & 4(s), Ex. 22)

Additionally, on December 8, 1995, Sanchez prepared a hand delivered memo to Werner informing him that he is required to undergo a Fitness for Duty Evaluation by Dr. Walter Davison, a psychiatrist at the Columbia Hospital Medical Arts Building in Milwaukee.

10

Sanchez stated AThe purpose of this evaluation is to determine your ability or inability to form the duties of your position.  Failure to comply with this and all aspects of evaluation may result in disciplinary action up to and including removal.@  The memo was copied to the Postal Service Health Unit, the Lead Plant Manager, the Work Injury Care Center, and AD. Malkowski.@  (Aff. Knight, & 4(t), Ex. 23)

Next, on or about December 8, 1995, Margaret Werner forwarded Pipes= December 8, 1995, notice of Anon-duty@ memo along to Dr. Rohr on behalf of Werner Aso you would be aware of what he is up against as far as his employment is concerned.@  Margaret further noted:

> As far as I can tell and see, Phil is taking his medicine, but I do not see it working like the lithium did.  He has moments to hours where I think he=s >back=, and there are times when he=s totally odd.  Animosity reigns high at times for a variety of reasons and his attention span is slim.  He cannot even concentrate on his son, which was formally a happy priority . . .  He has spent whatever money he can get his hands on foolishly.  He obtained a $1000 loan from his credit union to pay the rent, and the check bounced 3 days later, and he has no remorse or explanation.

(Aff. Werner, & 8, Ex. 24)

Werner was admitted to Milwaukee Psychiatric Hospital on December 17, 1995, on an inpatient basis to undergo psychiatric treatment for his bipolar manic depressive disorder.  (Aff. Knight, & 4(m), Ex. 16)  On December 28, 1995, Werner was discharged from Milwaukee Psychiatric Hospital.  (Aff. Knight, & 4(m), Ex. 16)

Dr. Rohr notified Werner=s union steward David Stenson on January 9, 1996, that he was Areleasing [Phillip Werner] to return to regular duty employment.@  Dr. Rohr also noted that although Werner would continue under his care and treatment on an outpatient basis, he Aappears to be in remission from his illness [bipolar manic depression] and

stabilized on his medication without untoward side effects which would interfere with his functioning.@ (Aff. Knight, & 4(u), Ex. 25)

On February 1, 1996, Werner was ordered for physical and mental Fitness for Duty examinations with Drs. Seter and Davison, respectively. No further information or records have been provided regarding the examinations. (Aff. Knight, & 4(v), Ex. 36)

By note dated March 27, 1996, Dr. Rohr again advised the Postal Service that due to illness, Werner was not to work overtime hours in that the stress caused by additional work could impair his health. (Ex. 1040) On March 29, 1996, the Postal Service Health Unit directed that no overtime hours be assigned to Werner. (*Id.*)

Dr. Rohr informed the Postal Service Health Unit on August 27, 1996, that Werner remained under his care and treatment. Rohr again notified the Postal Service of Werner=s need for reasonable accommodations, and requested that he be permitted to work no more than 40 hours a week due to his disability. (Aff. Knight, & 4(w), Ex. 27) On September 16, 1996, Dr. Rohr followed up by requesting that Werner=s recommended work hours restrictions be made a permanent accommodation. (Aff. Knight, & 4(x), Ex. 28)

On January 28, 1997, Dr. Rohr forwarded the appropriate Family Medical Leave Act documents to notify the Postal Service that Werner=s mental disorders are to be considered lifelong disabilities. Dr. Rohr added that Aovertime work prevents [patient] from maintaining compliance with his medication regime which then destabilizes his bipolar disorder.@ (Aff. Knight, & 4(y), Ex. 29)

On July 7, 1997, Dr. Rohr issued a note to the Postal Service indicating that Werner did not report to work on July 4 and 5, 1997, due to illness. Dr. Rohr continued Werner=s 40- hour work week restriction. (Aff. Knight, & 4(z), Ex. 30) On January 28, 1998,

Dr. Rohr notified the Postal Service through the appropriate FMLA paperwork that Werner "has a chemical imbalance and is on maintenance medication necessitating regular blood tests and evaluations." Dr. Rohr described Werner's condition as "lifelong," and limited Werner to a 40-hour work week. Dr. Rohr also indicated Werner "will need to see me every 2-3 months." (Aff. Knight, & 4(aa), Ex. 31)

Werner=s mental health was stabilized and functional during the remainder of 1998 leading up through the beginning of 1999. (Aff. M. Werner, & 7) However, on April 9, 1999, Werner was seen by psychiatrist Donna Burke in connection with a manic episode because Dr. Rohr was not on staff at Elmbrook Memorial Hospital. Dr. Burke observed that Werner had difficulty sleeping, which Werner self-described as "sleeping like a fox." Dr. Burke noted Margaret Werner=s descriptions of Werner=s "increased agitation, poor attention span, and difficulty in concentrating," and that "his job is in jeopardy." Werner was becoming "more and more suspicious and would distort what his wife would say." Nevertheless, Burke wrote in Werner=s family history that "[Phillip] is presently married to a wife who is really quite devoted to him, but having many struggles in dealing with his continuous illness." (Aff. Knight, & 4(bb), Ex. 32) Dr. Burke observed that Werner=s mental status deteriorated into "becoming psychotic" during a manic episode. Her observations included vacant stares in response to simple questions indicative of "trouble [in] processing," a lack of time orientation to months, laying down in the middle of conversations, quick to become agitated, and racing thoughts, which Werner mischaracterized as demonstrative of creative problem solving. (Aff. Knight, & 4(bb), Ex. 32) Further, Dr. Burke recalled that although Werner seemed to be able read

13

headlines in a newspaper during a manic episode, Ahe attempts to cover as to understanding what is meant.@ (Aff. Knight, & 4(bb), Ex. 32)

In a letter to Dr. Rohr dated April 20, 1999, Margaret Werner described Werner as having spent the entire week of April 12, 1999, Ain a state of grandiose, spending cash like it was water.@ She added that Werner had not been sleeping well, and had been waking up at odd hours and driving to George Webb restaurants to eat in the middle of the night C although he at least had been leaving notes as to where he is or where he was going. Margaret concluded, AI do see slight improvement since you added the Lithium, but he=s still not my Phil . . . The attention span isn=t there.@ (Aff. M. Werner, & 8, Ex. 33)

In Margaret Werner's April 26, 1999, letter to Dr. Rohr she described Werner as being Alike a total zombie. He doesn=t always know what day it is. . . . I see no signs of a manic anymore B he even took an expensive item back, but he=s still angry because I have the MasterCard hidden. . . . As I said before, nothing has been right since January and it=s really getting difficult at home.@ Margaret inquired whether it was safe for Werner to be at work or to drive. (Aff. M. Werner, & 8, Ex. 34)

On April 27, 1999, Dr. Rohr notified the Postal Service that Werner remained under his care and treatment and should be excused from work on April 28 and April 29, 1999. (Aff. Knight, & 4(cc), Ex. 35) Additionally, Dr. Rohr notified the Postal Service on September 16, 1996, that Werner Ahas a bipolar disorder and needs maintenance medication and periodic laboratory tests to monitor his health.@ Dr. Rohr described Werner=s disorder as Alifelong@, reiterated that AWork should not exceed 40 hours a week,@ and that Werner Awill need to see me every 2-3 months.@ (Aff. Knight, & 4(dd), Ex. 36)

On December 13, 1999, Dr. Rohr followed up stating in Werner=s FMLA paperwork that Werner=s serious health condition was Alifelong@ and that when Werner Aworks overtime it interferes with medications compliance and destabilizes his bipolar disorder.@ (Aff. Knight, & 4(ee), Ex. 37) Werner=s mental health was stabilized and functional during the remainder of 1999 through the first half of 2001.  (Aff. M. Werner,& 9)

Again, on January 2, 2001, Dr. Rohr notified the Postal Service in the appropriate FMLA paperwork that Phillip Werner=s bipolar disorder was a lifelong disability and that Awhen [Phillip] works overtime it interferes with medication compliance and destabilizes his bipolar disorder.@ The doctor emphasized Ano overtime@ and indicated that he did not expect Werner to have to Amiss work greater than 5 days/nights@ based on the expected frequency or duration of episodes of incapacity.  (Aff. Knight, & 4(ff), Ex. 38)

On or about the middle of June 2001,  Werner=s mental health began to decline into a series of manic episodes.  (Aff. M. Werner, && 10 and 11)   Defendants acknowledge Werner=s behavior and mental faculties were impaired substantially by his bipolar disorder during his manic episodes. (Defendants= August 25, 2004 Answer, && 13 and 14)  Werner began a medical leave from USPS on or about June 27, 2001.  At the time, the Postal Service was aware of the reasons for Werner's medical leave.   (Defendants= August 25, 2004, Answer, & 16)

On June 28, 2001, Werner left the family home.  Prior to leaving, Werner  told Margaret Werner that the Postal Service was trying to get rid of him by refusing to honor his medical leave. (Aff. M. Werner, && 12 and 15)

Case 2:04-cv-00557-CNC   Filed 03/24/06   Page 15 of 50   Document 64

On July 7, 2001, the Postal Service called the City of Franklin Police due to Werner-s erratic behavior. Franklin Police escorted Werner off the Postal Service property and Werner told them he would go to a hospital. Postal Service security promptly contacted Margaret Werner regarding Werner-s behavior and asked her if he had a propensity for physical violence during a manic episode. Margaret explained to Postal Service security the nature of Werner-s bipolar disorder. She clarified to security that Werner had never been physically violent towards her or anyone else as far as she knew, but that he was no longer coming home on a daily basis. (Aff. M. Werner, & 17)

On July 9, 2001, Franklin Police contacted Dr. Rohr regarding Werner. Apparently he had been located near the Milwaukee Airport. Lacking proof of violent tendencies, Dr. Rohr was unable to have Werner admitted involuntarily but did see him that day as an outpatient. Dr. Rohr determined that Werner presented Ahypomanic® and provided Werner with another prescription, but noted that he was likely in Aquestionable compliance.® (Aff. Rohr, & 5; Aff. Knight, & 4(gg), Ex. 39; Aff. M. Werner, & 13)

On July 11, 2001, Werner visited a Postal Service facility in Oak Creek, Wisconsin at 5:20 a.m. and was denied access to the employee's entrance pursuant to the instructions of Postal Service employee, Al Riley. (Ex. 1046) That same day, Werner returned to the postal facility at 1:30 p.m. and was told that he was not permitted to enter through the employee's entrance of the facility. Werner stated that he was aware that Riley gave the instruction for him to be refused entrance through the employee's entrance, and stated that he wished to speak with Riley. The employee who spoke with Werner detected the odor of what he thought was beer on Werner's breath. (*Id.*) Riley asked a clerk to contact the police yet spoke with Werner. Werner left the area before the police arrived. It appears

16

that in connection with Riley's conversation with Werner, Werner challenged him. Moreover, it appears that later on July 11, Werner went to the home of a Postal Service employee, and that other employees advised Riley that Werner "was not thinking straight and that [Riley] should be careful." (*Id.*)

On July 11, 2001, the Postal Service deactivated Werner's employment I.D. card. Werner's supervisor, Thomas Simonis, advised the Postal Service's Labor Relations office of that action, and a medical appointment was made for Werner. (*Id.*) Simonis decided that he would meet with Werner to observe his behavior. (*Id.*)

On July 12, 2001, Werner appeared at the Postal Service facility where he was employed and parked his car behind another car. Werner was asked to move his car and left the area. (*Id.*) Later that day, Werner returned to the facility and asked to speak with a supervisor. However, he left before a supervisor arrived. (*Id.*)

On July 12, 2004, Werner appeared for a third time and asked Simonis how much money he had and if he carried a lot of money. Werner said he was a gambler. (*Id.*) Simonis asked Werner if he was well and if he was prescribed medication. Werner advised that he took his medication that day and said that Simonis would not know how he feels. Next, Simonis asked whether Werner had talked to his wife and if she knew where he was. He advised Werner that he had deactivated Werner's I.D. card until the following Monday when Werner was to have his appointment. (*Id.*) Werner replied that Simonis was "on the top of his list" and stated that "we can do this the easy way or the hard way." When Simonis asked what he meant, Werner stated that Simonis did not want to know what the hard way was. (*Id.*) During a point in the encounter when Simonis was sitting, Werner approached him and stated, "What, your not a man to defend yourself." Werner then asked to speak with

17

employee Willis Nelson. Simonis informed Werner that he would give the message to Nelson. (*Id.*)

That same day, Simonis was asked to speak with Werner who was in a car across from the facility. (*Id.*) Simonis opined that Werner was not taking his medication, and Nelson informed Simonis that Werner was having some problems. (*Id.*)

On July 13, 2001, Werner visited the Postal Service facility where he was employed and asked to speak with a union representative. Werner was advised that his appointment was scheduled for July 16, 2001, but that a union representative would speak with him. Two union representatives spoke with Werner. (Ex. 1047) The security personnel informed the union representative about Werner's appointment on July 16, 2001. The representative advised that Werner wished to have his union dues payment returned to him. (*Id.*) However, Werner was informed that those funds would not be returned. Werner was further advised that if he returned to the facility on July 16, 2001, the police should be notified. (*Id.*)

That same day, Werner showed up at the postal facility near the train tracks, and the police were contacted. The Postal Service security again contacted Margaret Werner regarding Werner=s behavior. (Aff. M. Werner, & 18; Aff. Knight, ¶ 4(gg), Ex. 39)

On July 13, 2001, Simonis, requested that Werner be forced to undergo a Mental Fitness for Duty Examination because he had been Aacting differently, and coming around the building asking employees for money.@ The request was approved by facility manager Elizabeth Brown, and was received in the USPS Medical Unit on July 17, 2001. The bottom of the form included a handwritten note: ADr. Davison, emergency FFD if needed, 7-31-01.@ (Aff. Knight, & 4(hh), Ex. 40)

18

Werner was seen on an outpatient basis by Dr. Rohr in July of 2001. Dr. Rohr noted that Werner was Ashowing such poor judgment, you have to wonder what mental condition he could have possibly been in.@ Werner presented with grandiose and manic associations, including the expressed desire to move to Kenosha and to leave the post office to become a security agent or bartender at the dog track. (Aff. Knight Aff. & 4(gg), Ex. 39)

On July 19, 2001, Werner self-admitted to the emergency department of St. Luke=s Medical Center, and was seen by Dr. Jeff Adler. (Aff. Knight, & 4(ii), Ex. 41) Dr. Adler indicated that Werner=s reasons for self-admittance were that he felt Aout of balance, meaning that he feels manic.@ Furthermore, based on Werner=s expressions to the hospital staff, Dr. Adler observed:

> [Phillip] has been this way for some time. He is out of medications. He states he saw Dr. Rohr yesterday, who told him that he could be admitted if he did not improve. The patient denies suicidal ideation. He states he does feel like he would hurt somebody if anybody >fucked with me.= ... He states that he has been out walking around for the past 12 hours. He has been walking barefoot because he is trying to get calluses on his feet for >martial arts=. The patient states that he has not eaten in 36 hours.

Dr. Adler followed up with Dr. Rohr, who instructed that Werner be admitted as he Awas very manic.@ Dr. Adler found evidence of unfilled prescriptions. According to Dr. Adler, Werner was suffering from an Aacute manic episode.@ (Aff. Knight, & 4(ii), Ex. 41)

On July 19, 2001, Werner was admitted to a general psychiatric bed at St. Luke=s Medical Center on an inpatient basis. Dr. Venkata Thota conducted the initial physical the morning of July 20, 2001. Dr. Thota reported Aconcern about whether he has been compliant with his medication.@ (Aff. Knight, && 4(ii), and 4(jj), Exs. 41 and 42)

On July 20, 2001, Dr. Rohr conducted an extensive examination of Werner at St. Luke=s Medical Center. (Aff. Knight, & 4(gg), Ex. 39) That same day Dr. Rohr noted that Werner Ahas been most successful in staying abstinent from alcohol,@ and that previously Werner had done Arelatively well@ on an outpatient basis but that Athere would be periodic breakthroughs and failure to respond to Lithium,@ and, accordingly, Werner had been transferred onto a combination of Depakote and Risperdal. Although other health issues presented difficulty for Werner during that previous period, his mental health had been relatively stable. Dr. Rohr observed:

> He was, as of January of this year, enjoying playing chess and sheepshead on the computer, spending time with his family, etc. Again, in following him, he appeared to do well but then, unfortunately, began to decompensate in later spring of this year. He presented to my office of June 29, describing fragmented sleep, but denying any racing thoughts. He complained that the marriage was falling apart and that they were heading for divorce. [His medications were adjusted, but Dr. Rohr doubts he was compliant.] I would receive episodic calls from his wife stating that they had not heard from him, and eventually filed a missing person=s report. . . .

(Aff. Knight, & 4(gg), Ex. 39)

After recalling earlier July 2001 outpatient visits with Werner, on July 20, 2001, Dr. Rohr summarized Werner=s current status:

> We urged him to continue with the medicine . . . He is a bit disheveled. He is walking around, without socks, on his bare feet, and pacing back and forth. He appears to be mildly agitated as well as mildly sedated . . . He is somewhat demanding, . . . but appears to be amenable to staying in the hospital and taking his medications.@

After Dr. Rohr reviewed Werner=s various medications, side effects, and the attendant risks of not taking them as directed, Werner became more agitated and demanded a transfer to

20

Milwaukee Psychiatric Hospital to be seen by Dr. Gagrat. Nevertheless, in spite of Werner-s combativeness, Dr. Rohr identified Werner-s Apatient assets@ as a history of Aenjoy[ing] a good working relationship with his mental healthcare providers in the past and, furthermore, has a very loving and supportive wife.@ (Aff. Knight, && 4(gg) and 4(kk), Exs. 39 and 43)

On July 21, 2001, Werner underwent inpatient treatment at Milwaukee Psychiatric Hospital. He was discharged against the recommendation of his attending physician, Dr. Dinshah Gagrat, on July 27, 2001. (Aff. Knight, & 4(kk), Ex. 43) That same day, Dr. Gagrat identified Werner as Abipolar affective disorder type I B most recent episode manic.@ (Aff. Knight, & 4(kk), Ex. 43) Dr. Gagrat noted that Werner remained in a highly manic state at the time of his discharge. Although Werner had requested his transfer from St. Luke-s to Milwaukee Psychiatric Hospital, he was Asomewhat confused@ upon discharge:

> He took a cab from there, went to his credit union, picked up some money and then went on a shopping spree at a mall. He bought some $245.00 worth of clothes so he was evidently still out of control. He had been driving around in a rental car and he then ran out of gas so he left the car and walked away and he does not know what has happened to the car whether it was stolen or towed away.@

(Aff. Knight, & 4(kk), Ex. 43)

On July 21, 2001, Dr. Gagrat identified Werner-s Amajor problems as: Aimpulsivity and a tendency to make inappropriate comments to female patients and not respect boundaries. For example:

> On July 26 the patient had been given a pass. He came back with a new car and refused to give the car keys up to security barricading himself in his room. On that day he signed an AMA request for discharge. He said, >It is just too confining to be here. I have things to do.= ... He was calm, he simply said that he wanted to go to Germanfest for two days and if we were not

> willing to let him go on a pass from the hospital for two whole
> days then he wanted to be discharged against medical advice.@

(Aff. Knight, & 4 (kk), Ex. 43)  Finally, although Dr. Gagrat=s strongly felt that Werner needed

additional inpatient evaluation and hospitalization, Werner was discharged from Milwaukee

Psychiatric on July 27, 2001.  Dr. Gagrat wrote:

> In my opinion this patient was not homicidal or suicidal and not a
> danger to himself or others at this stage and, therefore, not
> committable . . . He did not disagree to take his medications at
> any time.@

(Aff. Knight, & 4(kk), Ex. 43)

On July 28, 2001, Scott Rennie, Human Resources Manager, ordered Werner

to undergo a mental Fitness for Duty Examination.  Rennie scheduled the Examination with

Dr. Walter Davison of the Columbia Medical Arts Building, 2015 East Newport Avenue,

Milwaukee, Wisconsin, 53211, on July 31, 2001.  As stated by  Rennie, AThe purpose of this

evaluation is to evaluate your [Phillip=s] current medical status and ability to return to work

safely.@ (Aff. Knight, & 4(ll), Ex. 44; Defendants= August 25, 2004, Answer, & 17)

Although Rennie=s memorandum was addressed to Werner at his permanent

home address with Margaret Werner at 1110 Links Court, Brookfield, Wisconsin, 53005-6934,

the memorandum regarding Werner=s required Fitness for Duty Evaluation hand delivered to

Werner in the presence of a union steward on July 30, 2001.  (Aff. Knight, & 4(ll), Ex. 44)

On July 31, 2001,  Werner notified Margaret Werner that he was going to have

some sort of medical exam to return to work. (Aff. M. Werner,& 19)  As instructed, on July 31,

2001,   Werner underwent a mental Fitness for Duty Examination with Dr. Davison.

(Defendants= August 25, 2004 Answer, & 18)

On August 1, 2001, in the wake of the July 31, 2001, Fitness for Duty examination, Dr. Davison wrote to Dr. Kaftan:

> Dear Dr. Kaftan,
>
> I examined Mr. Werner yesterday. He is psychotic and not fit for duty. He engaged in actions that seemed inappropriate and threatening to others while being evaluated. His drug and alcohol screen were negative despite smelling like alcohol.
> In addition, he had an abnormally low level of valproic acid indicating that he is not taking his medications. He needs inpatient psychiatric treatment.

(Aff. Knight, Ex. 45)

After the July 31, 2001, examination, Margaret Werner asked Phillip Werner how he did with the examination. Werner told his wife he thought he passed and would be returning to work shortly. She found this difficult to believe because she understood Werner was experiencing a full-blown manic episode. (Aff. M. Werner, & 19) On August 1, Dr. Gregory Kaftan of the USPS Health Unit for the Lakeland Performance Cluster mailed a letter to Werner=s home address in Brookfield, Wisconsin. Dr. Kaftan indicated that Werner had failed his Fitness for Duty exam and thus the USPS considered him Αunfit to work because your psychiatric condition is not under control.@ To return to work, Werner would have to provide Αdocumentation that you are compliant with the recommendations made in the Fitness for Duty.@ Dr. Kaftan synopsized the report and indicated only that Dr. Davison Αsuggested@ that Werner undergo inpatient treatment. Dr. Kaftan concluded by alerting Werner that the letter from the Postal Service would be forwarded along to Dr. Rohr Αso that issues raised in the Fitness for Duty are addressed.@ (Aff. Knight, && 4(nn) and 4 (mm), Exs. 45 and 46)

23

On August 1, 2001, Dr. Kaftan=s Health Unit case record indicates that he consulted with Dr. Rohr and informed him that Dr. Davison had found Werner not fit for duty. According to Dr. Kaftan=s Health Unit case record, Dr. Rohr stated that AMr. Werner was off meds, he had tried to hospitalize him but Mr. Werner went to another hospital and he has not seen him since. He agreed that Mr. Werner was not fit [for duty] until he got back on meds.@ (Aff. Knight, & 4(oo), Ex. 47)

On August 1, 2001, Dr. Kaftan=s case records indicate that the USPS Health Unit made one attempt at contacting Margaret Werner with information of Werner=s failed evaluation. (Aff. Knight, & 4(oo), Ex. 47) No further entries were made in the USPS Health Unit=s medical records regarding Werner after August 1, 2001. (Aff. Knight, & 4(oo), Ex. 47)

That same day Werner was charged in Milwaukee County with exceeding the speeding limit. (Ex. 1054) He entered a no contest plea on August 7, 2001, and was directed to pay a fine. (*Id.*)

On August 2, 2001, Margaret Werner received the August 1, 2001, letter from Dr. Kaftan, addressed to Phillip Werner, regarding Werner=s failed Fitness for Duty evaluation. Margaret opened the letter, which contained Dr. Kaftan=s incomplete synopsis of Dr. Davison=s evaluation. (Aff. M. Werner, & 21) Dr. Kaftan=s letter did not include language from Dr. Davison=s July 31, 2001, report stating Werner had displayed physically threatening behavior towards others, was psychotic, and needed inpatient treatment. (Aff. Knight, && 4(mm) and 4(nn), Exs. 45 and 46)

A day after receiving the letter from Dr. Kaftan, Margaret Werner received a phone call from Phillip Werner. Margaret informed him about the contents of Dr. Kaftan=s

letter, and he returned home a few hours later. (Aff. M. Werner, & 22) Due to Werner=s pronounced lack of reading comprehension during his manic phases, he asked Margaret Werner to read him the letter from Dr. Kaftan. After hearing the contents of the letter, Werner became very upset and said he wanted to take the letter to the Postal Service so he could confer with his Union representative. (Aff. M. Werner, & 22)

On August 8, 2001, Werner called Margaret Werner while en route to the Postal Service to tell her that he was going to sign a document to get access to his 401K account, and that he did not need her signature to do so. He told Margaret he wanted to withdraw his Thrift Savings Plan funds, but Margaret knew he could not deplete his TSP account in the same manner he had done to his bank and checking accounts, and she dismissed Werner=s rantings as a manic episode. (Aff. M. Werner, & 23)

When Werner appeared at the Postal Service, he demanded to be given as yet unspecified Aforms.@ Porter stated that Werner was argumentative and proved so disruptive that the receptionist called Porter in to assist in handling his demands. (Defendant=s June 24, 2004 Response, Ex. 1008) Porter provided a resignation form to Werner and permitted him to sign it at that point. Porter allowed him to sign the form which she alone accepted immediately. (Defendant=s June 24, 2004, Response, Ex. 1008) Werner identified his home address, shared with Margaret Werner, as his mailing address: 1110 Links Ct., Brookfield, Wisconsin, 53005. He left the section describing AReasons for Resignation@ blank. Porter failed to fill in this section as had been done for Werner's prior resignation in 1988. (Defendants= June 24, 2004, Response, Ex. 1004; Defendants= June 24, 2004, Response, Ex. 1001)

The Postal Service failed to notify Margaret Werner or anyone else residing at 1110 Links Ct., Brookfield, Wisconsin, 53005, that Werner had tendered his resignation. (Aff. M. Werner, && 25, 26, and 29)

On August 13, 2001, Dr. Kaftan and the Postal Service Health Unit received Dr. Davison=s in-depth Fitness for Duty Examination report regarding Werner=s mental incapacity. Dr. Davison authored the detailed report on July 31, 2001, the same day he conducted Werner's Fitness for Duty examination. (Aff. Knight, & 4(pp), Ex. 48) Werner refused to fill out his portion of the required medical history during the evaluation. (Aff. Knight & 4(pp), Ex. 48) Dr. Davison documented that during July of 2001 when Werner was on a leave of absence from work, he was discovered Alurking around@ USPS repeatedly, and was even reported to have started a fire in a trash can at USPS. (Aff. Knight, & 4(pp), Ex. 48) Dr. Davison noted that his first interaction with Werner occurred when he encountered him asleep on the floor of the room where Dr. Davison was to conduct the Fitness for Duty examination. Dr. Davison's report indicated that Werner carried a two-iron golf club with him to the examination, and brandished it about the room, waving it in a threatening manner. (Aff. Knight, & 4(pp), Ex. 48) The report stated that Werner=s speech was full of grandiose associations. For example, he described himself as a contender in a martial art's competition in Las Vegas later that year (accounting for his bare feet). Also, Werner said he saw himself as an industry mogul with grand inventions pending. (Aff. Knight, & 4(pp), Ex. 48) Dr. Davison=s July 31, 2001, detailed report stated unequivocally that while Werner=s Aprocess of thought was easy to follow,@ he was Aclearly delusional,@ had engaged in threatening conduct towards others, needed inpatient treatment, and was Adefinitely not fit for duty.@ (Aff. Knight, & 4(pp), Ex. 48) The detailed report concluded that Werner was so incapacitated, that

a standard psychological tests such as the MMPI (Minnesota Multiphasic Personality Inventory was not even attempted. (Aff. Knight, & 4(pp), Ex. 48)

Based on Dr. Davison=s detailed July 31, 2001, detailed report, Dr. Kaftan concluded that Werner was Aunfit until further notice,@ labeled him a Ahigh risk/restriction,@ and that no further accommodations would reduce the risk or restrictions. (Aff. Knight, & 4(pp), Ex. 48)

Dr. Davison=s August 13, 2001, report is distinguished from Dr. Gagrat=s AAgainst Medical Advice@ discharge report regarding Werner from July 27, 2001, because it demonstrated that Werner's manic episode had worsened. Dr. Gagrat=s July 27, 2001, report specifically highlighted the lack of risk or threats he perceived Werner posed to himself or others. The absence of threats by Werner was the primary motivating factor as to why Dr. Gagrat felt he had to acquiesce to Werner=s request for a medical discharge in spite of his severely manic episodes. According to Dr. Kaftan=s records, the lack of threatening behavior had tied Dr. Rohr=s hands also, and precluded him from acting to involuntarily hospitalize Werner. (Aff. Knight, && 4(pp), 4(kk), and 4(oo), Exs. 43, 47, and 48)

Dr. Kaftan=s August 1, 2001, letter regarding Werner=s failed Fitness for Duty examination was copied to the Labor Relations department at the Postal Service. In July of 2001, Simonis and Facility Manager Elizabeth Brown were aware that Werner had been exhibiting strange and unusual behavior around work. Scott Rennie, Human Resources Manager and Bonnie Mitchell, Labor Relations Manager, were aware that Werner=s mental capacities had been called into question by the demand for a mental Fitness for Duty examination. (Aff. Knight, && 4(hh), 4(ll), 4(nn), Exs. 40, 44, 46) At the time of Werner=s purported resignation on August 8, 2001, Postal Service Labor Relations had been made

aware that Werner had been declared unfit to work, that his psychiatric condition was not under control, and that he was in need of inpatient care. And, As a result of Dr. Davison=s detailed examination report of July 31, 2001, the Health Unit was aware that Werner was marked as a Ahighest risk.@ As a result, individuals throughout the Postal Service's personnel, labor relations, and health unit departments, were well aware that Werner was incapacitated to the point where he was not mentally fit for duty. (Aff. Knight Aff. && 4(nn), 4(hh), 4(ll), and 4(pp), Exs. 46, 40, 44, and 48)

Prior to August 8, 2001, the Postal Service had a practice of communicating with Dr. Rohr and Margaret Werner regarding Werner=s condition or behavior at work. (Aff. M. Werner, && 16, 17, 18, and 21) Yet the Postal Service never provided Margaret Werner with a copy of Dr. Davison=s July 31, 2001, detailed report at any time prior to Werner=s death. (Aff. M. Werner, & 24) The Postal Service never contacted Margaret Werner either in writing or by telephone regarding Dr. Davison=s determination that Werner was psychotic, delusional, and posed a threat to his safety or that of others. (Werner, M. Aff. & 24)

On August 15, 2001, two days after the Health Unit received Dr. Davison=s report, the Postal Service terminated Werner=s employment based upon the signed but incomplete resignation form obtained from Werner on August 8, 2001. (Defendants= June 24, 2004 Response Ex. 1004) The Postal Service never delivered a copy of its Notification of Personnel Action processing Werner=s termination from the postal service to Margaret Werner, Phillip Werner, or anyone else residing at 1110 Links Ct., Brookfield, Wisconsin, 53005. (Aff. M. Werner, & 29)

Dr. Rohr was unaware at all times leading up to Werner=s death that Werner had tendered a resignation. Dr. Rohr did not see Werner after July 2001, but presumed that he continued to be psychotic and mentally incapacitated in the period of time leading up to his death. (Aff. Rohr, && 5 and 16)

On August 25, 2001, Werner used his credit card with a $3,000 credit limit to purchase clothing, shoes and jewelry at Marshall Fields in Wauwatosa, Wisconsin. The bill was sent to the Brookfield address where Margaret Werner resided. Margaret Werner later reached agreement on a compromised amount of the debt from the use of the credit card. (Ex. 1061)

Margaret Werner had numerous telephone conversations with Werner during August and September of 2001, which led her to conclude that Werner had no idea that he had resigned his position at the Postal Service. (Aff. Werner, && 25, 27-28)

On August 29, 2001, Werner was charged in Milwaukee County with disorderly conduct. It was alleged that on August 28, 2001, he went to the residence of Sherry Miller, stood on the patio area of the location for four hours, removed window screens and attempted to enter the residence. (Ex. 1062) An order restraining Werner from contacting Miller was issued, and the bond was set at $500. On August 30, 2001, Werner signed a form stating that he would obey the conditions of his release. His next appearance was scheduled for September 17, 2001. (*Id.*)

On September 20, 2001, Margaret Werner filed for divorce in Waukesha County. (Ex. 1063) Among other things, she sought an order for child support, maintenance, her attorney fees, and income assignment. That petition was accompanied by an affidavit from Margaret Werner requesting a temporary order directing Werner to vacate her residence,

prohibiting him from "molesting and imposing any restraints on or interfering [with her] personal liberty," and appointing a guardian ad litem for Werner, "if necessary." (*Id.*) In her affidavit, Margaret Werner stated that she feared that she and her son's rights would be jeopardized unless Werner was restrained from encumbering, disposing of, or removing their marital property outside of Wisconsin. (*Id.*)

Arrangements were made to serve Werner with the summons and petition for the action. The summons stated that the address was "C/O 8049 N. 102nd Street, Milwaukee, Wisconsin." (*Id.*)

On September 28, 2001, Werner was served with the summons at Elmbrook Memorial Hospital, 19333 West North Avenue, Brookfield, Wisconsin. Werner admitted his identity to the process server. (*Id.*)

On October 6, Werner was arrested for missing an earlier court date in connection with an August 29, 2001, citation for disorderly conduct in Milwaukee County. Werner remained in police custody. However, he called Margaret Werner from jail asking for money. It was their last conversation before Werner=s death. (Aff. M. Werner, & 28) On October 12, 2001, Werner went into severe cardiac arrest and died while in police custody. (Defendants= June 24, 2004, Response, Ex. 1005)

On October 19, 2001, Margaret Werner first contacted the Postal Service in an attempt to procure the forms necessary to begin the process of receiving the life insurance and survivor benefits, including a roll-over of Werner=s Thrift Savings Program account, and a continuation of her health coverage. (Plaintiffs= Amended Consolidated Complaint, & 32; Defendants= August 25, 2004, Answer, & 32)

30

On October 19, 2001, a Postal Service employee with the first name of Mylka informed Margaret Werner that Werner had resigned on August 8, 2001. (Plaintiffs=Amended Consolidated Complaint, & 32; Defendants= August 25, 2004, & 32)  This was the first time she learned that the Postal Service considered Werner to have resigned on August 8, 2001. (Aff. M. Werner, & 29)  Margaret Werner offers that it became clear to her that the Postal Service had violated her husband's rights under the Rehabilitation Act, and was continuing to violate her and her son's rights under numerous statutes.  (Plaintiffs' Amended Consolidated Complaint, ¶ 33, Aff. M. Werner, ¶ 31)

On October 23, 2001, Dr. Rohr confirmed in writing to Margaret Werner that Werner had suffered a recurrence of his bipolar affective disorder beginning in the middle of June of 2001.  According to Dr. Rohr:

> Phillip=s illness was characterized by severe impairment of his judgment and lack of insight to the point that he could not appreciate the consequences of his decisions.  Both I, as well as several other psychiatrists, attended Phillip in July through and including September.  In reviewing the records, it is quite obvious that he has been described as being markedly impaired psychiatrically during all of his encounters with these psychiatrists.

(Aff. M. Werner, ¶¶ 8, 30, Ex.31; Defendants= June 24, 2004, Response, Ex. 1006)  Until Margaret had telephoned him following Werner=s death, Dr. Rohr had not heard from Werner or the Postal Service that Werner had resigned on August 8, 2001.  Dr. Rohr had not been contacted regarding Dr. Davison=s detailed report of July 31, 2001.  (Aff. Rohr, && 5 and 9)

Under the cover of a letter dated November 29, 2001, an EEO Complaint of Discrimination in the Postal Service was filed by "Phillip Werner (Margaret Werner administrator)."  (Ex. 1071)  The EEO complaint charged that on August 8, 2001, the Postal

Service "discriminated against Mr. Werner based upon a disability ("Bi-polar")." It identified Postal Service employee Terry Porter as the official who was responsible for the discrimination. (*Id.*) The EEO complaint sought withdrawal of Werner's resignation and his reinstatement to August 8, 2001. In response to an inquiry by the Postal Service, counsel for the complainant stated that Werner's representative would participate in the Postal Service's mediation program. (Ex. 1072)

Thereafter the Postal Service advised that a settlement meeting would be conducted on December 7, 2001. (Ex. 1073) The letter noted that three officials would participate in the meeting: Jeff Conway, Manager, Labor Relations, Scott Rennie, Manager, Human Resources, and Shirley Konczak, Manager, Personnel Services. (*Id.*) Counsel for the complainant noted that Margaret Werner and Ruth Witt (Margaret Werner's sister-in-law) would participate in the mediation session with the assistance of their attorney. (Ex. 1074)

The parties reached a settlement regarding the EEO complaint, and Scott Rennie, Tricia L. Knight, and Margaret Werner signed the agreement on December 12, 21, and 26, 2001, respectively. (Defendants= June 24, 2004, Response, Ex. 1016; Plaintiffs= Amended Consolidated Complaint, & 36; Defendants= August 25, 2004, Answer, & 36 (in part)).

Under the terms of the original agreement:

a.　　The Estate of Phillip Werner would withdraw the EEO complaint and any other outstanding complaints,

b.　　Phillip Werner=s resignation from the Postal Service would be rescinded and all official documents pertaining to his resignation revoked, with all records updated to reflect Phillip=s continuous employment until his death on October 12, 2001;

c.   Margaret Werner would receive any and all benefits to which she was entitled as the surviving spouse of Phillip Werner;

d.   Margaret Werner would personally receive a lump sum payment of $5,000;

e.   Margaret Werner's legal counsel would be paid all reasonable attorney and paralegal fees associated with the EEO complaint;

f.   Margaret Werner would receive an additional $1700 lump sum for compensation for payments made to Phillip's Flexible Spending Account.

Additionally, subsequent addenda referenced attorneys fees and paralegal fees payments to:

Tricia L. Knight and Ruth Witt, compensation for past medical insurance premiums, and the remedies that would be available should either party breach the terms of the EEO Settlement Agreement.

(Defendants' June 24, 2004, Response, Exs.1016, 1021, 1022, 1023, and 1024)

Provisions of the settlement agreement that involved payments of money to Margaret Werner in her individual capacity were not implemented as agreed because the Postal Service determined later that payment to Margaret Werner in her individual capacity was inappropriate.  Ostensibly, this was because the EEO complaint was filed on behalf of the deceased Phillip J. Werner by Margaret Werner in her capacity as Special Administrator of Phillip Werner's estate.  (Ex. 1071) Consequently, it was agreed that the complainant would withdraw the EEO complaint and that the complainant was entitled to all benefits the "estate/beneficiary would have been entitled to if the resignation had not been processed." (Ex. 1075) Moreover, the settlement agreement provided "that Complainant (Margaret Werner, [SSN]) will be paid a $5,000 lump sum payment (minus appropriate and applicable

33

deductions in accordance with State and Federal Law and Postal Regulations)." (*Id.*) Another paragraph of the settlement agreement stated that "[t]he Complainant [would] also be paid a separate $1,700.00 . . . lump sum payment minus applicable withholding and deductions for the compensation for payments made to Phillip Werner's Flexible Spending Account." That paragraph did not include references to when the $1,700.00 payment was to be made. (*Id.*)

As a result of the settlement agreement, counsel for the complainant advised the Postal Service's EEO Office on December 12, 2001, that counsel believed the EEO complaint had been fully resolved, and that a formal letter withdrawing the EEO complaint would be sent when the agreement had been finalized. (Ex. 1076) The Postal Service advised that the EEO complaint had been formally designated as Case No. 4-J-530-0030-02. (Ex. 1077) On December 28, 2001, counsel for the complainant signed a form by which the EEO complaint could be withdrawn formally. (Ex. 1078)

Counsel for the complainant signed an addendum to the settlement agreement on January 18, 2002. (Ex. 1080) That addendum which was signed by Jeff Conway of the Postal Service on February 6, 2002, included the agreement of the Postal Service to pay the medical insurance premium owed by Werner for the months of September and October of 2001. (*Id.*) Also, the addendum provided that Margaret Werner was free to request that the terms of the settlement agreement be implemented, and that she could appeal disputes about the settlement agreement to the EEOC. (*Id.*)

On February 7, 2002, Jeff Conway of the Postal Service asked the Postal Service's Accounting Service Center to pay Margaret Werner the $5,000 amount that was specified in the settlement agreement. (Ex. 1081) Conway signed another addendum to the

settlement agreement for the EEO case, as did counsel for the complainant. (Ex. 1082) The second addendum, which was undated, provided that as part of settlement of the EEO complaint, the Postal Service would pay counsel for the complainant "legal fees" of $4,282. (*Id.*) The addendum provided also that $2,175 of the $4,282 would be paid to the complainant's attorney, and $1,567 would be paid to Ruth Witt.

On March 1, 2002, Tricia L. Knight, counsel for Margaret Werner, contacted HR Manager Scott Rennie regarding the Postal Service's failure to abide by the specific terms of the agreement. The conversation was followed up by a letter to Rennie on March 5, 2002. (Plaintiffs= Amended Consolidated Complaint, & 38; Defendants= August 25, 2004, Answer, & 38; Defendants= June 24, 2004 Response, Ex. 1025) Counsel advised Rennie that none of the payments (totaling $10,982) had been paid. Particularly, the letter stated that incorrect forms for the Death Benefit Payment Rollover had been completed, and that the correct forms were to be sent by February 22, 2002. However, Margaret Werner did not received the forms (postmarked February 28, 2002) until March 2, 2002. The letter added that employee Sandra Donnell told Margaret Werner that she would receive a lump sum check for Death Benefit Payments which had accrued since October of 2001, but someone else advised Margaret Werner that she would not receive such a check and instead would be eligible for amounts that would accrue after the paperwork had been fully processed. According to the letter, benefits would accrue at the rate of $1,312.14 per month and Margaret Werner could lose $7,872.84 "at a minimum" if the benefits were not deemed to accrue beginning in October of 2001. (Ex. 1083)

On March 12, 2002, the Postal Service issued two checks in connection with the settlement agreement. Both checks were not in accordance with the settlement agreement,

and one of the checks was made payable to a payee that was not specified in the settlement agreement. (Ex. 1085) Specifically, one of the checks was made payable to Margaret Werner in the amount of $2,598.01. The second check was in the amount of $3,897, and was made payable to "William N. Werner, Minor Desig benef of Phillip J. Werner Decd c/o Margaret Werner . . . . " (*Id.*)

It appears that on March 21, 2002, the Postal Service returned the checks to its check issuing component with instructions to issue a check in the amount of $6,700 to Margaret Werner (the total payment amount reflected in the settlement agreement). (*Id.*)

By a letter dated April 8, 2002, Roderick Eves, Deputy Managing Counsel of the Postal Service's Law Department in St. Louis, Missouri advised counsel for the complainant that the Postal Service remained willing to issue a check for the outstanding $6,700 amount reflected in the settlement agreement. However, he noted that it would only issue that check to the Estate of Phillip J. Werner, and not to Margaret Werner individually. In that regard, the letter mentioned that counsel for the complainant had advised previously that Margaret Werner would not accept a check in that form, and that she wished to have the check made payable to her individually. (Ex. 1086)

Eve's letter requested Margaret Werner to reconsider that position based upon the following:

> First, any standing your client has to proceed with a pending EEO complaint, and thereby enter into a settlement agreement, is based on her status as the representative of her husband's estate. *Smith v. Dept. of Housing & Urban Development*, 01831925 (1985) (applying D.C. law, "any cause survives either to the benefit or the detriment of the deceased estate"). Consistent with this principle, your client signed the Settlement Agreement at issue as "Complainant (Estate of Phillip Werner)."

36

> Second, applicable state law likewise mandates that the proceeds of any settlement agreement be paid to Mr. Werner's estate. Specifically, Wisconsin law provides that causes of action for "other damages to the person" survive the death of the person and may be brought by the person's estate. Wis. Stat. Ann. § 895.01 (2001). This includes causes of action for personal injury and pain and suffering. *Koehler v. Waukesha Milk Co.*, 208 N.W. 901 (1926); *Estate of Jerrick*, 605 N.W.2d 645 (1999). However, "the proceeds when collected are treated as personal property assets of the estate of said deceased and to be so distributed according to law. *Koehler, supra*, 208 N.W. at 902.
>
> Accordingly the Postal Service maintains that it is required, by the applicable law of both the EEOC and the State of Wisconsin, to make the check payable to Estate of Phillip J. Werner.

(*Id.*)

In an April 10, 2002, letter addressed to Eves, counsel for the complainant stated that during a conversation an April 4, 2002, conversation, Eves advised orally that the Postal Service determined that it would make the $6,700 settlement check payable to the Estate of Phillip J. Werner, and that Margaret Werner had no standing to sue the agency. Counsel for the complainant disagreed with the Postal Service's position. (Ex. 1087)

On April 10, 2002, and in accordance with 29 C.F.R. §1614.504, counsel for Margaret Werner, filed a complaint with the Postal Service alleging that the agency was in breach of the settlement agreement and that, if the Postal Service failed to rectify its breach, Margaret Werner=s EEO Complaint Case No. 4-J-530-0030-02 should be reopened and reinstated. (Plaintiffs=Amended Consolidated Complaint, & 41; Defendants=August 25, 2004, Answer, & 41)

On April 17, 2002, Eves advised counsel for the complainant that he regretted Margaret Werner's decision not to accept the check for the $6,700 made payable to the Estate of Phillip J. Werner. (Ex. 1089)

On April 19, 2002, the Postal Service's EEO Dispute Resolution Office advised counsel for the complainant that it was conducting an inquiry into the disability discrimination allegation that was made in the EEO complaint, which was designated as EEO Case No. 4-I-530-0030-02 (Ex. 1090)

On May 20, 2002, counsel for the complainant again advised the Postal Service that she represented "Mr. Phillip Werner, Deceased - Estate of Mr. Phillip Werner." (Ex. 1091)

The Postal Service issued a Final Agency Decision on May 22, 2002, stating that no breach of the Settlement Agreement existed. Although the Postal Service acknowledged its actions were inconsistent with the agreement, it maintained that it was required to do so by law. (Plaintiffs= Amended Consolidated Complaint, & 42; Defendants= August 25, 2004, Answer, & 42; Defendants= June 22, 2004, Response, Ex. 1035)

On May 28, 2002, counsel for the complainant informed the Postal Service that in connection with EEO Case No. 4-I-530-0030-02, she was still retained to represent "the Estate of Phillip Werner." (Ex. 1093)

The United States Office of Personnel Management related to Margaret Werner on June 17, 2002, that to insure that she would have income while that agency processed her application, the agency had placed her in interim payment status. The letter went on to state that payments to her for the period from October 13, 2001, to May 30, 2002, would be $140.52. The letter added that the interim payment status would continue until OPM determined the exact amount of her payments. The letter went on to say that Margaret Werner's payments while in that status would be less than the final amount of her payments. (Ex. 1094)

Again, on June 17, 2002, counsel for the complainant advised the Office of Federal Operations (OFO) of the EEO that Margaret Werner was appealing the "Final Agency Decision" that the Postal Service issued. (Ex. 1095) On June 27, 2002, the complainant's counsel added that Margaret Werner had only recently been advised that she had full medical insurance through the Postal Service since October of 2001. Counsel further asserted that payments for that medical insurance had not been made in accordance with paperwork completed in December of 2001, and that Margaret Werner had been informed that payments for that coverage had been withdrawn from monies she was to receive, and which she had not consented to have applied toward the medical insurance. (*Id.*) In the letter, counsel contended that in December of 2001, Margaret Werner completed paperwork with the agency to have the proceeds in Werner's TSP transferred to her checking account. Counsel offered that the Postal Service had only recently given Margaret Werner access to the TSP funds, and that had she been provided access earlier, she could have rolled over the TSP funds. The letter maintained that Margaret Werner lost money as a result of the delay in giving her access to the TSP funds and demanded documents and information under the Freedom of Information Act to which the Postal Service responded. (*Id.*)

In connection with the complainant's appeal of the Final Agency Decision issued by the Postal Service in EEO Case No 4-I-530-0030-02, the parties filed documents with the Office of Federal Operations (OFO). (Ex. 1097 and 1098) In a May 20, 2003, decision, the OFO affirmed the "Final Agency Decision" that the Postal Service issued in EEO Case No. 4-J-530-0030-02. (Ex. 1099) The OFO held that because Werner Adid not initiate the EEO process by at least contacting an EEO Counselor,@ Margaret Werner, as the surviving spouse, Alacked standing to enter into a settlement agreement on behalf of her deceased husband

pursuant to EEO Regulations.@ (EEOC OFO Decision, Appeal No 01A23-611, at page 4; Defendants= June 24, 2004, Response, Ex.1041) The OFO issued a notice of Complainant=s Right to File a Civil Action. (EEOC OFO Decision, Appeal No. 01A23-611; Plaintiffs= Amended Consolidated Complaint, & 45; Defendants= August 25, 2004, Answer, & 45)

Finally, by letter dated August 6, 2003, counsel for the complainant submitted three claims to the Postal Service under the Federal Torts Claim Act. (Ex. 1100) One of the claims was filed on behalf of Margaret Werner, and sought payment of $1.5 million. Another was filed on behalf of her son, William Werner, and sought payment of $1.1 million. A third was filed on behalf of the Estate of William J. Werner, and sought payment of $1.5 million. These tort claims revolved around the claims that were the subject of EEO Case No. 4-I-530-0030-02. (*Id.*) Those claims were denied by the Postal Service on the grounds that the claims were not actionable under the Federal Tort Claims Act. (*Id.*)

CONCLUSIONS OF LAW

In every federal case, the party bringing the suit must establish standing to prosecute the action. *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 124 S. Ct. 2301 (2004). Standing determines whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975).

Standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case or controversy requirement, and prudential standing, which embodies "judicially self-imposed limits on the exercise of federal jurisdiction. *Elk Grove Unified School Dist.*, 542 U.S. at 12. The Article III limitations require a plaintiff to show that the conduct of which he complains has caused him to suffer an "injury in fact" that a favorable judgment will

redress. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed.2d 351 (1992). The Supreme Court has not defined the prudential dimensions of the standing doctrine exhaustively, but has explained that prudential standing encompasses "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen*, Allen v. Wright, 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984).

Prohibitions on third-party claims are a prudential standing limitation recognizing that claims are best prosecuted by those who actually have been injured, rather than by someone in their stead. *See Warth v. Seldin*, 422 U.S. 490, 499, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975). The Supreme Court has established a narrow exception to this doctrine, allowing third-party claims when the third-party plaintiff can show a close relationship between the first and third party and some obstacle to the first party's ability to protect his own interest. *See Powers v. Ohio*, 499 U.S. 400, 411, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991); *Shimer v. Washington*, 100 F.3d 506, 508 (7th Cir. 1996).

Defendants acknowledge the traditional Article III analysis, but maintain that the case law does not address situations brought by estates of federal employees. Courts have held that the language of the Rehabilitation Act also evinces Congress' intent to confer standing to the outer limits of Article III. *Tandy v. City of Wichita*, 380 F.3d 1277 (10th Cir. 2004). Under traditional Article III analysis, the estate appears to have standing insofar as it stands in the shoes of the decedent who is alleged to have suffered an injury in fact. The estate argues that Werner was terminated from his job with the Postal Service involuntarily on the basis of his disability and that it was not permitted to pursue the actual Rehabilitation

41

Act claims and damages that would have flowed to the estate from proof of those claims. The estate contends that discrimination resulted from the knowing and/or intentional conduct of the defendant and that a favorable verdict will address the damage. *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982).

If the analysis ended here, the plaintiffs would prevail on their pending motion for partial summary judgment to the extent they seek standing only for the estate rather than Margaret Werner individually. However, the court must also evaluate the interaction between the Rehabilitation Act, and the regulatory scheme for claiming discrimination set forth at 29 C.F.R. § 1614, *et seq.* Section 1614.103(a) states that discrimination complaints, including those falling under the Rehabilitation Act, "shall be processed in accordance with this part." 29 C.F.R. § 1614.103(a). Section 1614.103(c) provides that "this part applies to all employees and applicants for employment, and to all employment policies or practices affecting employees or applicants for employment." 29 C.F.R. § 1614.103(c). In addition, section 1614.106(c) requires that a complaint of discrimination contain a signed statement from the person claiming to be aggrieved, or from that person's attorney. Finally, another section of the regulations requires that the employee or applicant for employment must at least make initial contact with an EEO counselor within 45 days of the discriminatory act. 29 C.F.R. § 1614.105(a)(1).

These regulations do not expressly authorize an estate of a deceased employee to bring a claim. Consistent with these regulations, the Office of Federal Operations determined that settlement agreement between Margaret Werner and the Postal Service was unenforceable under EEO regulations because Werner did not initiate the EEO process by

42

at least contacting an EEO Counselor. Therefore, his spouse lacked standing to enter into a settlement agreement at issue on behalf of her husband and the estate of Phillip Werner could not seek enforcement of the terms of the agreement. *Estate of Phillip Werner v. Potter*, 2001 WL 2121000028 (EEOC May 15, 2003). In reaching that decision, the OFO cited *Barnes v. United States Postal Service,* 1992 WL 1372734 (EEOC October 30, 1992).

In *Barnes*, a complainant's widow and executrix filed an appeal with the Commission for a determination as to whether the agency complied with the terms of the settlement agreement that it had entered with the complainant. *Id.*, at 2. The OFO held that the regulations do not provide for requests for reinstatement or implementation to be made on behalf of a complainant's estate, and that there was no evidence that the complainant raised the issue of the agreement prior to his death. *Id.* Moreover, the widow had filed additional complaints on behalf of the estate with regard to the issues of harassment, light duty and reasonable accommodation. *Id.* The OFO rejected these attempts to bring discrimination claims on the ground that the regulation does not provide for complaints to be raised after an employee's death on behalf of the estate. While acknowledging certain instances where a federal employee's EEO complaint may survive his death, it does not apply in cases that were not initiated by the employee but by the estate. Id.

In so holding, the OFO reasoned that the remedies that may be ordered by the Commission when discrimination is found are designed to make the victim of discrimination "whole" or place him in the position he would have occupied absent the discriminatory action. Because there was no evidence in *Barnes* that the complainant incurred any expenses prior to his death as a result of the alleged discriminatory action, the complainant would not have been entitled to monetary relief. The relief would have been equitable in nature, and no

43

administrative purpose would have been served by the continued processing of the complaints. *Id.*

Similarly, in *Estate of Yao Hu v. Marvin T. Runyon, Jr., Postmaster General, United States Postal Agency*, 1996 WL 657792 (EEOC November 6, 1996), the EEOC OFO held that a widow could not file a discrimination claim on behalf of her deceased husband where the employee died before initiating a complaint. Other cases, including *Estate of Donnie Powell v. Steven R. Cohen, Acting Director, Office of Personnel Management,* 2001 WL 135460 (EEOC February 6, 2001), and *Estate of Paul Anderson v. John E. Potter, Postmaster General, United States Postal Service, Agency,* 2003 SL 22288515 (EEOC September 23, 2003), hold unequivocally that a complainant's spouse, acting as a personal representative, does not have standing to initiate the EEO process on behalf of her deceased husband. Indeed, the surviving spouse in *Anderson* initiated contact with an EEO Counselor while her husband was hospitalized but her husband died before she filed a formal complaint on his behalf. Such contact was held insufficient to confer standing.

The critical element appears to be some action taken to initiate the EEO process prior to an aggrieved party's death. *Estate of John A. McCoy v. John E. Potter, Postmaster General, United States Postal Service, Agency,* 2003 WL 22763114 (EEOC November 14, 2003); *Estate of Ginter v. John E. Potter, Postmaster General, United States Postal Service Agency*, 2001 WL 884842 (July 11, 2001); *Estate of James M. Brenner v. Marvin T. Runyon, Jr. Postmaster General, United States Postal Agency,* 1997 WL 40611 (EEOC January 10, 1997). In *Estate of Brenner*, James M. Brenner contacted an EEO counselor asserting he had been discriminated against because of a physical and mental disability (depression). However, before he conducted an initial interview with the EEO counselor, Brenner committed

suicide. The agency dismissed the complaint on the ground that Brenner's wife filed in an untimely manner, but the Commission reversed holding that "all time limitation periods are subject to waiver, estoppel, and equitable tolling." *Id.*, at 3.

As acknowledged by the plaintiff estate, there is a paucity of authority to confer standing on an estate to bring initial EEO claims where the decedent was incapacitated by mental illness just prior to his death and no one made an attempt to contact an EEO Counselor. The estate contends that the principles of equitable tolling used to circumvent the requirement that the employee make initial contact with an EEO counselor within 45 days of the discriminatory act pursuant to 29 C.F.R. § 1614.105(a)(1) should apply to the standing issue. Section 1614.105(a)(2) provides that the agency or the Commission shall extend the 45-day time limit when "the individual shows that he or she was not notified of the time limits and was not aware of them, that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission."

In making its argument, the estate relies on *Pueschel v. Veneman,* 185 F. Supp. 2d 566 (D. Md. 2002) where the district court denied a motion to dismiss a Title VII complaint and ordered discovery to go forward on the limited issue of whether equitable tolling applied. Doris Katz worked for the United States Department of Agriculture, and believed she had not been treated fairly by her employer. While hospitalized she addressed a letter to "Dear USDA Representative," and authorized her daughter to represent her on a series of ten issues. *Id.*, 185 F. Supp. 2d at 570. The daughter, Deborah Katz Pueschel, met with the Administrator

of the Inspection Service ostensibly for the "purpose of initiating an EEO Complaint" but the daughter was never referred to an EEO Counselor. Soon thereafter, Katz died. More than sixty days later, her daughter initiated the EEO process. The agency dismissed her complaint for failure to state a claim, and observed that the "EEOC has ruled that the survivor of a deceased federal employee has no standing to file an EEO complaint on behalf of the former employee. While a complaint initiated by a federal employee may survive her death, the estate of that employee has no right to file a complaint." *Id.*, 185 F. Supp. 2d at 571.

The district court did not address standing beyond the timeliness issue, and focused solely on whether the daughter's meeting with the agency head prior to her mother's death constitutes the informal contact required by EEOC regulations with respect to federal employee discrimination claims. The court noted that the there was little support for the assertion that the meeting was for the purpose of initiating an EEO complaint, but that a belatedly-filed affidavit by the plaintiff's sister had the potential to give rise to the application of one of the exceptions to the exhaustion requirement: waiver, estoppel or equitable tolling. *Id.*, at 573. In allowing further discovery, the court indicated that it would consider whether, as an equitable concept, tolling should apply posthumously, even assuming that it would otherwise apply if the department head "affirmatively lulled" Katz into not making contact with an EEO counselor (either personally or through her daughter). *Id.*

There are obvious distinctions between *Pueschel* and the case at bar. In *Peuschel*, Doris Katz, the federal employee, took action to authorize her daughter to pursue claims on her behalf. The daughter took steps to initiate the process before her mother's death, and the issue before the court was whether those steps satisfied the exhaustion requirement. Here, no action was taken by Werner or Margaret Werner with respect to

initiating the EEO process prior to Werner's death.  Hence, there is no "smoking gun" similar to the affidavit in *Pueschel* that would support some finding that contact had been initiated.

Plaintiff is asking the court to take an unprecedented step and graft the equitable doctrines of tolling, waiver or estoppel on the doctrine of standing.  Even if the court followed that course, it would apply the same standards governing equitable tolling in this circuit.  That is, mental illness tolls a statute of limitations only if the illness *in fact* prevents the sufferer from managing his affairs and thus from understanding his legal rights and acting upon them.  *Miller v. Runyon*, 77 F.3d 189 (7th Cir. 1996).

In *Miller*, a former employee of the Postal Service claimed he was fired in violation of the Rehabilitation Act because he was handicapped by a psychiatric disorder (manic depressive).  *Id.*, 77 F.3d at 190.  The Seventh Circuit Court of Appeals discussed the doctrine of equitable tolling in analyzing whether Miller's suit under the Rehabilitation Act was time-barred under 29 C.F.R. § 1614.105(a)(1).  The Seventh Circuit rejected the argument that a mental illness "per se tolls statutes of limitations in all cases in which discrimination on the basis of that mental illness is the basis of the suit:"

> This is tantamount to suggesting that there are no statutes of limitations in such cases since most serious mental illnesses, such as mania, depression, and schizophrenia, are not curable, although they are traceable, and thus are lifelong affairs.  With the recent generalization by the Americans with Disabilities Act of the strictures of the Rehabilitation Act to the economy as a whole, the suggestion that claims of discrimination against the mentally ill are subject to no time limitation has far-reaching implications for the liability of employers.

Moreover, the Seventh Circuit has distinguished the defense of equitable estoppel and equitable tolling.  *Id.*, 77 F.3d at 191.  A defendant who through misleading misrepresentations or otherwise prevents the plaintiff from suing in time will be estopped from

47

pleading the statute of limitations.  *Id.*  However, even if the defendant is faultless, where a plaintiff "because of disability, irremediable lack of information, or other circumstances beyond his control just cannot reasonably be expected to sue in time, the statute of limitations will be tolled until he is able through the exercise of proper diligence to file his suit."  *Id.*

As such, the plaintiff estate would be required to show that Werner suffered from a mental disability rendering him incapable of understanding the events leading to his resignation or in the sixty-five days following his resignation.  Also, the record indicates that he left his home but remained in contact with his wife.  He told his wife, Margaret Werner, that the Postal Service was trying to get rid of him by refusing to honor his medical leave, and that he was having a medical examination to return to work.  Werner visited his wife at their home and appeared visibly upset when she read him the contents of the letter wherein he was informed that he was unfit for duty and in need of inpatient care.  Additionally, Werner informed his wife that he was going to withdraw money from his TSP account, he operated his car, plead no contest to a speeding violation, and met with union representatives.  During this period, Werner visited his psychiatrist on an outpatient basis and self-admitted to an emergency room.  On the other hand, Dr. Davison found Werner to be mentally ill, psychotic, delusional and in need of inpatient treatment at the July 31, 2001, fitness for duty examination.  Further, Werner's actions between July and October of 2001 suggested that he was not taking his medications and that he remained ill during this period.  Moreover, defendants have presented evidence that Werner threatened coworkers, was arrested for disorderly conduct, and exhibited behavior which was not in his best interest.

Assuming that plaintiffs could show that tolling confers standing on an estate, that would not end the inquiry.  In addition, equitable tolling would require assessment of

whether Margaret Werner took reasonable steps to file her claim after learning of the discrimination that is being claimed. This undertaking may be problematic inasmuch as there is evidence that Margaret Werner was aware of the extent to which Werner's mental health was affecting his behavior. She and Dr. Rohr were informed that Werner was found unfit for duty. Moreover, the record indicated that Margaret Werner did not believe Werner when he told her that his fitness for duty examination went well because she understood he was "experiencing a full-blown manic episode." Also, Margaret Werner received from the Postal Service and read to Werner the letter finding him unfit for duty. Moreover, Margaret Werner had repeated contact with the Postal Security during the relevant period and filed for divorce seeking a restraining order and the appointment of a guardian "if necessary."

These factual determinations are beyond the scope of what the court set for briefing, as well as whether the estate of Phillip Werner can demonstrate that Werner satisfies the requirements of the Rehabilitation Act. Plaintiffs must be given an opportunity through discovery to develop their allegations that the defendants failed to engage in an interactive process with Werner, his wife and/or psychiatrist and that there were reasonable accommodations available. According to the plaintiffs, these failures allowed the defendants to accept and process Werner's resignation knowing that he was mentally incapacitated. Because a scheduling order has not been entered in this case, the court will set this on an expedited course but allow discovery to proceed before plaintiffs' claims are tested on summary judgment. In the interim, the parties are strongly urged to discuss a resolution of this case. The amount of time and resources devoted to the issues which have been addresses at this stage of the litigation is regrettable, especially because of the settlement activities discussed above.

Now, therefore,

IT IS ORDERED that plaintiff's motion for partial summary judgment is denied.

IT IS FURTHER ORDERED that defendant's motion to dismiss is denied.

IT IS FURTHER ORDERED that the parties shall appear for a scheduling conference on Tuesday, April 18, 2006, at 9:00 a.m, in Courtroom 222, U. S. Courthouse, 517 E. Wisconsin Ave., Milwaukee, Wisconsin.

Dated at Milwaukee, Wisconsin, this 24th day of March, 2006.

BY THE COURT


s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge

Case 2:04-cv-00557-CNC   Filed 03/24/06   Page 50 of 50   Document 64